IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

LAJUANA CHERI MATHEWS,

      Plaintiff,                              No. CIV S-09-1802 GGH

    vs.

MICHAEL J. ASTRUE,                 <u>ORDER</u>
Commissioner of
Social Security,

      Defendant.
_____/

        Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"). For the reasons that follow, Plaintiff's Motion for Summary Judgment is denied, the Commissioner's Cross Motion for Summary Judgment is granted, and the Clerk is directed to enter judgment for the Commissioner.

<u>BACKGROUND</u>

        Plaintiff, born October 24, 1975, applied on May 24, 2007 for disability benefits. (Tr. at 84.) Plaintiff alleged she was unable to work due to chronic muscuskeletal system disorder, which caused joint stiffness and problems with walking, sitting and standing; and schizophrenia. (Tr. at 97.) In a decision dated January 22, 2009, ALJ Mark C. Ramsey

determined that plaintiff was not disabled. The ALJ made the following findings:[1]

>  1.   The claimant met the insured status requirements of the Social Security Act through December 31, 2007.
>
>  2.   The claimant has not engaged in substantial gainful activity since November 22, 2002, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
>
>  3.   The claimant has the following severe impairments: fibromyalgia, right hip bursitis, schizophrenia and depression (20 CFR 404.1521 *et seq.* and 416.921 *et seq.*).
>
>  4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 404.925 and 416.926).

---

[1] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. § 401 et seq.   Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. § 1382 et seq. Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A). A parallel five-step sequential evaluation governs eligibility for benefits under both programs. See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287 (1987). The following summarizes the sequential evaluation:

>  Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
>  Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.
>  Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1? If so, the claimant is automatically determined disabled. If not, proceed to step four.
>  Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.
>  Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).
    The claimant bears the burden of proof in the first four steps of the sequential evaluation process. Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5. The Commissioner bears the burden if the sequential evaluation process proceeds to step five. Id.

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform unskilled, light work with some postural limitations as defined in 20 CFR 404.1567(a) and 416.967(b). Light work includes lifting no more than 20 pounds occasionally and 10 pounds frequently; standing and walking up to 6 hours in an 8 hour day and sitting up to 6 hours in an 8 hour day. Unskilled work involves little or no judgment to do simple duties that can be learned on the job in a short period of time. This is in contrast to semi-skilled work which may required alertness, close attention, or coordination and dexterity to do repetitive tasks quickly (Social Security Ruling 83-10). In additional unskilled jobs ordinarily involve dealing primarily with objects, rather than with data or people (Social Security Ruling 85-15). The claimant could only occasionally climb ramps and stairs and never climb ladders, rope or scaffolds. She could occasionally balance, stoop, kneel, crouch and crawl. She should avoid concentrated exposure to hazards.

6. The claimant is unable to perform any past relevant work. (20 CFR 404.1565 and 416.965).[2]

7. The claimant was born on October 24, 1975 and was 27 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English. (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules directly supports a finding of "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform. (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a.)

11. The claimant has not been under a disability, as defined in the Social Security Act, from November 22, 2002 through

---

[2] The ALJ report mistakenly numbered two findings as (5). (Tr. at 18, 22.) Herein they are numbered (5) and (6), with subsequent findings numbered accordingly.

the date of this decision. (20 CFR 404.1520(g) and 416.920(g)).

(Tr. at 16-23.)

ISSUES PRESENTED

Plaintiff has raised the following issues: A. Whether the ALJ Properly Rejected the Examining Opinion of Dr. Lee and the Mental Limitations Assessed by the DDS Physicians; B. Whether the ALJ Failed to Properly Credit Plaintiff's Testimony Regarding Plaintiff's Functional Limitations; C. Whether the ALJ Failed to Properly Assess Plaintiff's Residual Functional Capacity and Erred in Utilizing the Grids and Failing to Secure the Testimony of a Vocational Expert.

LEGAL STANDARDS

The court reviews the Commissioner's decision to determine whether (1) it is based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in the record as a whole supports it. Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999). Substantial evidence is more than a mere scintilla, but less than a preponderance. Connett v. Barnhart, 340 F.3d 871, 873 (9th Cir. 2003) (citation omitted). It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Orn v. Astrue, 495 F.3d 625, 630 (9th Cir. 2007), quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted). "The court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation." Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008).

/////
/////
/////
/////

4

ANALYSIS

    A. <u>Whether the ALJ Properly Rejected Medical Opinions by Dr. Lee and DDS</u>

        1. <u>Dr. Lee's Opinion</u>

Plaintiff claims that the ALJ failed to credit the opinion of Dr. Lee, a one-time examining physician, that plaintiff could sit for six hours, "allowing breaks every hour for change of posture[.]" (Tr. at 285.) As to this finding of Dr. Lee's, the ALJ stated: "There is nothing in the record to support this. The undersigned rejects the opinion of the need for postural breaks every hour." (Tr. at 21.) Plaintiff also alleges that the ALJ mischaracterized certain of Dr. Lee's findings (<u>see</u> fns. 5,6); however, the undersigned finds the ALJ to have summarized Dr. Lee's report with reasonable accuracy, rejecting only that portion of his opinion advising hourly postural breaks. (<u>Compare</u> Tr. at 21 (ALJ's summary of Dr. Lee's report) <u>with</u> Tr. at 282-286 (Dr. Lee's report).)

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals. Holohan v. Massanari, 246 F.3d 1195, 1201 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).[3] Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual. Id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996).

To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court considers whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions. An ALJ may reject an *uncontradicted* opinion of a

---

[3] The regulations differentiate between opinions from "acceptable medical sources" and "other sources." See 20 C.F.R. §§ 404.1513 (a),(e); 416.913 (a), (e). For example, licensed psychologists are considered "acceptable medical sources," and social workers are considered "other sources." Id. Medical opinions from "acceptable medical sources," have the same status when assessing weight. See 20 C.F.R. §§ 404.1527 (a)(2), (d); 416.927 (a)(2), (d). No specific regulations exist for weighing opinions from "other sources." Opinions from "other sources" accordingly are given less weight than opinions from "acceptable medical sources."

1   treating or examining medical professional only for *"clear and convincing"* reasons. Lester , 81

2   F.3d at 831.  In contrast, a *contradicted* opinion of a treating or examining professional may be

3   rejected for *"specific and legitimate"* reasons.  Lester, 81 F.3d at 830.  While a treating

4   professional's opinion generally is accorded superior weight, if it is contradicted by a supported

5   examining professional's opinion (supported by different independent clinical findings), the ALJ

6   may resolve the conflict.  Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing

7   Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)).  The regulations require the ALJ to

8   weigh the contradicted treating physician opinion, Edlund v. Massanari, 253 F.3d 1152 (9th Cir.

9   2001),[4] except that the ALJ in any event need not give it any weight if it is conclusory and

10  supported by minimal clinical findings.  Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir.1999)

11  (treating physician's conclusory, minimally supported opinion rejected); see also Magallanes,

12  881 F.2d at 751.  The opinion of a non-examining professional, without other evidence, is

13  insufficient to reject the opinion of a treating or examining professional.  Lester, 81 F.3d at 831.

14          In regard to Dr. Lee, the ALJ summarized his opinion in a July 2007 neurologic

15  evaluation that plaintiff

> walked with a normal gait and appeared to sit comfortably during
> the exam.  She was able to get on and off the examining table and
> had no difficulty taking her shoes off.  She was able to toe walk
> without difficulty, but had difficulty walking on her heels with pain
> in her hips. . . . Dr. Lee diagnosed right hip pain, right greater
> trochanter bursitis, and schizophrenia, by history.  Dr. Lee stated
> that the claimant is able to stand and walk six hours in an eight
> hour day with normal[5] breaks to sit down; she is able to sit for six

---

[4] The factors include: (1) length of the treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis; (5) consistency; (6) specialization. 20 C.F.R. § 404.1527

[5] Plaintiff argues that the ALJ mischaracterized Dr. Lee's report as to how often plaintiff would need to take a break from standing or walking.  Dr. Lee found that "[t]he number of hours she can stand and walk is six hours, allowing breaks to sit down due to the pain in the hips." (Tr. at 285.)  While the ALJ interpreted this to mean that plaintiff would require "normal" breaks from standing, plaintiff interprets it to mean that plaintiff "would require breaks, at will, to accommodate her hip pain." (Plff's MSJ at 14.)   Because Dr. Lee did not explain how

>hours, allowing breaks every hour for change of posture. She is able to lift 25 pounds occasionally and 20 pounds frequently.
>
>. . . [Dr. Lee] found her capable of performing light work. Although she [has] pain in her right hip, his examination was otherwise normal.[6]

(Tr. at 21; see id. at 282-286 (Dr. Lee's report).)

Based on the medical evidence before it, including Dr. Lee's report, the ALJ concluded that plaintiff's allegations of "severe restrictions in her ability to sit, stand, walk and lift" are "not credible due to the fact that there are very limited findings and no surgery is recommended." (Tr. at 21.) The ALJ favorably cited Dr. Lee's finding that plaintiff was "capable of light work." (Id.) However, the ALJ disregarded Dr. Lee's opinion that plaintiff required hourly breaks from sitting (and possibly, as plaintiff urges, from standing) to change posture, stating: "There is nothing in the record to support this." (Id.)

Plaintiff asserts that there is record evidence to support plaintiff's need for hourly postural breaks. Most on point is plaintiff's own testimony that she could be on her feet for about one hour total per day and sit for 30-45 minutes per day, and that if she wasn't standing or sitting she was probably "laying down trying to get comfortable." (Tr. at 56-57.) However, as discussed below, the ALJ found that plaintiff's "subjective complaints and allegations regarding her functional limitations are not fully credible[,]" which the undersigned finds to be supported by substantial evidence. (Tr. at 21.) Plaintiff's other cited evidence, including documented muscle spasms, chronic fatigue, chronic neck/back/hip/leg pain, impaired sleep, morning

---

frequently plaintiff would need to take a break from standing or walking, and the ALJ, in turn, did not explain what he meant by "normal" breaks, the undersigned does not consider the ALJ's use of the word "normal" to amount to a mischaracterization. See Curry v. Sullivan, 925 F.2d 1127, 1131 (9th Cir. 1990) (an error which has no effect on the ultimate decision is harmless).

[6] Plaintiff also takes issue with the ALJ's statement that Dr. Lee found plaintiff "otherwise normal" but for pain in her right hip. Plaintiff states this is a mischaracterization of plaintiff's condition as described by Dr. Lee. Here again, the court declines to parse what the ALJ meant by "normal" and is satisfied that the ALJ accurately summarized Dr. Lee's findings. (See Tr. at 21.)

7

stiffness, difficulty walking, and fibromyalgia, goes to plaintiff's general medical condition, but does not bear specifically on whether plaintiff would be able to sit or stand for more than one hour without taking a break. This is the only point on which the ALJ rejected Dr. Lee's opinion. (Tr. at 21.)

In August 2007, following Dr. Lee's evaluation of plaintiff, Dr. Meek, a non-examining physician at DDS, assessed plaintiff's physical residual functional capacity. (Tr. at 305-309.) Dr. Meek's primary diagnosis of plaintiff was "generalized musculoskeletal pain" with a secondary diagnosis of "history of possible seizure disorder." (Tr. at 305.)

In his report, Dr. Meek stated that the examining source statement regarding plaintiff's physical capacities (i.e., Dr. Lee's report) was in his file, and that his findings did not differ significantly from Dr. Lee's. (Tr. at 309.) However, as to the disputed issue of whether plaintiff required hourly postural breaks, Dr. Meek found that plaintiff's exertional limitations included the ability to "stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday" and to "sit (with normal breaks) for a total of about 6 hours in an 8-hour workday." Notably, Dr. Meek marked this choice on the evaluation form instead of one stating that plaintiff "must periodically alternate sitting and standing to relieve pain and discomfort." (Tr. at 306.) This is consistent with the ALJ's finding that plaintiff could stand, walk, or sit for up to six hours in an eight-hour day without requiring hourly postural breaks.

Assuming nonetheless that Dr. Lee's opinion as to plaintiff's need for postural breaks was "uncontradicted" by an independent medical examiner, the question is whether the ALJ had "clear and convincing" reasons for rejecting it. The undersigned concludes that, given the complete lack of record evidence supporting plaintiff's need for hourly breaks (aside from plaintiff's own testimony, which was found to be not fully credible, as described below), and plaintiff's documented ability to walk, sit, get on and off the examining table, and take her shoes off without any apparent difficulty or discomfort, the ALJ had clear and convincing reasons for rejecting this particular finding of Dr. Lee's.

2. DDS Opinion

Plaintiff claims that the ALJ failed to credit the DDS physician with respect to the severity of plaintiff's mental disability. In relevant part, the ALJ stated:

> DDS finds that there is insufficient evidence to find the claimant's mental condition severe. However, new evidence from the claimant's treating sources show the claimant had a chronic mental problem. Due to the claimant's complaints of pain, depression, and auditory hallucinations, the undersigned finds the claimant is limited to unskilled work. This is consistent with the testimony of the claimant at the hearing and the record as a whole.

(Tr. at 22.)

In his psychiatric review of plaintiff on July 31, 2007, DDS's Dr. Amado found that plaintiff suffered from schizophrenia and depression. (Tr. 289-290.) As to functional limitations, he found that she had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace. (Tr. at 295.) In his consultant's notes, Dr. Amado concluded:

> In the aggregate, it appears that a psych MDI is revealed, which would not preclude at least unskilled work activity in a low-stress, non-public setting. Great weight is given to the MER from psych clinic on file. Mental allegations are credible, just not at listings-level severity, physical issues aside. There is insufficient evidence from 11/02 to 11/06.

(Tr. at 297.)

Also on July 31, 2007, Dr. Amado conducted a mental residual functional capacity assessment of plaintiff.[7] (Tr. at 299-301.) Similar to his psychiatric assessment, he concluded that plaintiff was moderately limited in her ability to carry out detailed instructions, maintain attention and concentration, perform activities on a schedule, and interact socially. (Tr.

---

[7] Plaintiff refers to this assessment as taking place on July 21, 2007. However, it appears that Dr. Amado also conducted this assessment on July 31, 2007. (Tr. at 301.)

9

at 299-300.) He also found that she was moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform without an unreasonable number and length of rest periods. (Tr. at 300.) As before, Dr. Amado noted: "There is insufficient evidence from 11/02 to 11/06." (Tr. at 301.)

Plaintiff argues that, "[t]aken as a whole, these 'moderate' limitations would no doubt cause a significant work impairment." (Plaintiff's MSJ at 16.) She also argues that the ALJ mischaracterized Dr. Amado's findings about "insufficient evidence." Whereas Dr. Amado noted that there was insufficient evidence to determine plaintiff's mental condition between November 2002 and November 2006, plaintiff argues, the ALJ mistakently concluded that there was "insufficient evidence to find plaintiff's mental condition severe." (Tr. at 22.)

The undersigned finds that any error in this regard was harmless, as the ALJ ultimately concluded that plaintiff "had a chronic mental problem" that limited her capacity to work (Tr. at 22), and indeed found plaintiff to be severely impaired with schizophrenia and depression. (Tr. at 16.) Similarly, plaintiff's argument that the ALJ failed to "mention of any of the evidence documenting [plaintiff's] diagnosed Fibromyalgia" is addressed by the fact that the ALJ found plaintiff to be severely impaired with fibromyalgia. (Tr. at 16.)

The issue here is not whether plaintiff had these impairments, but whether the ALJ properly found that plaintiff could nonetheless do certain types of unskilled work. Arguably, this finding stands in contrast to Dr. Amado's finding that plaintiff was "moderately" limited in her ability to work without undue interruptions from psychological problems and/or frequent breaks. However, the opinion of a non-treating physician, without other evidence, is not accorded great weight. See Lester, supra, 81 F.3d at 831. Here, the undersigned finds the ALJ's conclusions about plaintiff's ability to perform certain jobs, despite her mental problems and fibromyalgia, to be supported by the record as a whole. Progress notes from Turning Point Pathways in 2007 indicate that plaintiff "describes mood as 'OK' and mood appears to be stable" (Tr. at 368); plaintiff "reports feeling 'safe' and very good' because she does not have to struggle

to get by day to day anymore" and "[h]er mood has been stable" (id. at 367); plaintiff "continues to overall do fairly well" and "her mood continues to be stable" (id. at 365); and plaintiff has "no reports of mood symptoms" and "her mood continues to be stable" (id. at 363). Similarly, Turning Point progress notes from 2008 indicate that plaintiff consistently reported she was doing well, and that her mood was stable and improving due to better pain control. (Tr. at 349-357.) The undersigned concludes that the ALJ did not err in his weighing of the DDS physician's medical opinion as to the severity of plaintiff's mental disability.

B. Whether the ALJ Failed to Properly Credit Plaintiff's Testimony Regarding Plaintiff's Functional Limitations

Plaintiff states that the ALJ improperly rejected her credibility as to the severity of her functional limitations.

The ALJ determines whether a disability applicant is credible, and the court defers to the ALJ who used the proper process and provided proper reasons. See, e.g., Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1995). If credibility is critical, the ALJ must make an explicit credibility finding. Albalos v. Sullivan, 907 F.2d 871, 873-74 (9th Cir. 1990); Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990) (requiring explicit credibility finding to be supported by "a specific, cogent reason for the disbelief").

In evaluating whether subjective complaints are credible, the ALJ should first consider objective medical evidence and then consider other factors. Vasquez v. Astrue, 547 F.3d 1101 (9th Cir. 2008); Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir.1991) (en banc). The ALJ may not find subjective complaints incredible solely because objective medical evidence does not quantify them. Bunnell at 345-46. If the record contains objective medical evidence of an impairment possibly expected to cause pain, the ALJ then considers the nature of the alleged symptoms, including aggravating factors, medication, treatment, and functional restrictions. See id. at 345-47. The ALJ also may consider the applicant's: (1) reputation for truthfulness or prior inconsistent statements; (2) unexplained or inadequately explained failure to seek treatment or to

follow a prescribed course of treatment; and (3) daily activities.[8]  Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996); see generally SSR 96-7P, 61 FR 34483-01; SSR 95-5P, 60 FR 55406-01; SSR 88-13.  Work records, physician and third party testimony about nature, severity, and effect of symptoms, and inconsistencies between testimony and conduct, may also be relevant.  Light v. Social Security Administration, 119 F.3d 789, 792 (9th Cir. 1997).  The ALJ may rely, in part, on his or her own observations, see Quang Van Han v. Bowen, 882 F.2d 1453, 1458 (9th Cir. 1989), which cannot substitute for medical diagnosis.  Marcia v. Sullivan, 900 F.2d 172, 177, n.6 (9th Cir. 1990).  Plaintiff is required to show only that her impairment "could reasonably have caused some degree of the symptom."  Vasquez, 547 F.3d at 1104, *quoting* Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007), Smolen, 80 F.3d at 1282.  Absent affirmative evidence demonstrating malingering, the reasons for rejecting applicant testimony must be clear and convincing, and supported by reference to specific facts in the record. Vasquez, 547 F.3d at 1104-05.

        The ALJ found that plaintiff was not credible with regard to the intensity, persistence or functionally limiting effects of her pain and other symptoms "to the extent they are inconsistent with [plaintiff's] residual functional capacity assessment."  (Tr. at 20.)  In that assessment, the ALJ noted, for example, that plaintiff is able to iron, sweep, mop, although it takes an hour or two; that she does laundry with the help of her daughter, goes grocery shopping with her case worker, and walks for exercise.  (Tr. at 19.)

        Later in his report, the ALJ reiterated that, based on the evidence he reviewed,

> it is found that the claimant's subjective complaints and allegations regarding her functional limitations are not fully credible.  The

---

[8] Daily activities which consume a substantial part of an applicants day are relevant.  "This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability.  One does not need to be utterly incapacitated in order to be disabled."  Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001) (quotation and citation omitted).

12

        claimant states that she quit work due to injuries sustained in a motor vehicle accident on November 22, 2002. In a Questionnaire filled out by the claimant's former employer indicated that she quit work on October 10, 2002, before the accident due to reasons unrelated to her impairment. The claimant alleges severe restrictions in her ability to sit, stand, walk and lift. Her allegations are not credible due to the fact that there are very limited findings and no surgery recommended.

(Tr. at 21.)

        As to the circumstances surrounding plaintiff's November 22, 2002 car accident, plaintiff responded to the ALJ's questions at her November 4, 2008 hearing as follows:

> Q: And you last worked – you put down – is it October 2002 or November 2002?
>
> A: October of 2002.
>
> Q: Okay. And why'd you stop working?
>
> A: A health emergency in my family.
>
> Q: And what was the health emergency?
>
> A: My youngest son was about three and he contracted severe asthma and was in the hospital for quite a while.
>
> Q: When is it that you became unable to work?
>
> A: As of November of 2002.
>
> Q: Particular day? You have the --
>
> A: 22nd.
>
> Q: – 22nd. What's the significance of that day?
>
> A: That child and I were in a terrible car wreck.
>
> Q: You were in a car wreck that day?
>
> A: Correct.
>
> Q: And you have not worked since, correct?
>
> A: Correct.

(Tr. at 46.)

13

By way of comparison, plaintiff's employer during that period described the events leading to the termination of plaintiff's employment as follows:

> On 10/7/02 she called in because her kids were sick. On 10/8/02, she called and said she had no transportation. On 10/9/02 she didn't call at all. On 10/10/02, she didn't call but HR called her to ask if she planned on coming in and she said no that she would be in to drop off her key.

(Tr. at 128.) The ALJ also noted that, at a medical examination on September 5, 2003, plaintiff stated that she had quit work the previous October due to knee pain. (Tr. at 20, citing Ex. 2F, Tr. at 223.) Given these facts, the ALJ could properly conclude that plaintiff's inconsistent statements about why she quit her last job (child's asthma, lack of transportation, knee pain), as well as the fact that she left work several weeks prior to her allegedly disabling injury, reflected poorly on her credibility.

Moreover, it is not at all clear from the medical record that plaintiff's November 2002 car accident significantly impacted her ability to work, as plaintiff claimed. The ALJ cited plaintiff's medical examination on the day of her car accident, in which "X-rays of the cervical and lumbar spine were taken and findings were normal. CT scan of the abdomen and pelvis were normal . . . CT of the brain was normal. She was prescribed Motrin and released." (Tr. at 20, citing Ex. 1F, Tr. at 195-210.) On February 6, 2003, plaintiff was diagnosed with back pain and hypertension; however "X-rays of the right and left knee showed no evidence of fracture or significant degenerative changes. There was no joint effusion." (Tr. at 20, citing Ex. 2F, Tr. at 237. ) In a follow-up appointment on March 30, 2003, X-ray findings showed "the lumbar vertebrae are in normal alignment" and plaintiff's spinal condition was "unremarkable." (Id., citing Ex. 2F, Tr. at 232.) The ALJ could properly consider any inconsistency between plaintiff's stated reason for quitting work and her medical reports during that period as bearing on her credibility.

Plaintiff next contends that her functional limitations and restrictions were due to her diagnosed fibromyalgia, and that "[g]iven her diagnosis and symptoms it could be reasonably

expected that she would have severe restrictions in her ability to sit, stand, walk, and lift." (Plaintiff's MSJ at 19.)  Certainly, as noted earlier, the ALJ found based on the medical evidence that plaintiff was severely impaired with fibromyalgia.  (Tr. at 16.)  That much is not at issue. The question is whether the ALJ properly found plaintiff less than credible as to her resulting functional limitations, most notably, her claim that she could only stand or sit for one hour or less during an eight-hour day.

In reviewing the medical records for evidence of plaintiff's functional restrictions, the ALJ cited an August 2007 medical report in which plaintiff "described chronic pain and mood changes since her motor vehicle accident in 2002."  In that same report, however, plaintiff noted that she walked for exercise for 45 minutes per day.  (Tr. at 21; see id. at 368.)  In September 2007, Turning Point Pathway records show that plaintiff reported she was feeling "very good" and "doing fine," but still had "chronic pain in her legs."  (Tr. at 363-367.)  In November 2007, plaintiff reported "feeling good," and Dr. Tonnu at Turning Point Pathways noted that better pain control seemed to be contributing to her improved mood.  (Tr. at 360.)  In December 2007, plaintiff reported that "chronic pain is well controlled," and Dr. Tonnu again noted that plaintiff was experiencing "better pain control." (Tr. at 358.)  In January 2008, plaintiff stated that her "energy is good and chronic pain is well controlled."  (Tr. at 357; see id. at 355 (also noting plaintiff's "better pain control")).  In April 2008, Turning Point records indicate that plaintiff "states she will find a job if SSI does not come through[.]" (Tr. at 351.) These records call into question plaintiff's testimony that her pain was so debilitating that she could sit or stand for an hour or less per eight-hour period, and would have to spend the rest of the time "laying down trying to get comfortable."  (Tr. at 57.)

Based on these records and other evidence of plaintiff's condition, including plaintiff's ability to perform daily tasks and Dr. Lee's observations that plaintiff could apparently sit and walk without difficulty, the ALJ concluded that there were "very limited findings" in support of plaintiff's claimed functional limitations.  The undersigned finds that the ALJ properly

15

analyzed the evidence in relation to the appropriate factors required by the <u>Bunnell</u> line of cases and gave "specific, cogent reasons" for his disbelief.  <u>Rashad</u>, <u>supra</u>, 903 F.2d at 1231.

    C. <u>Whether the ALJ Failed to Properly Assess Plaintiff's Residual Functional Capacity and Erred in Utilizing the Grids and Failing to Secure the Testimony of a Vocational Expert</u>

Plaintiff contends that the ALJ's finding that plaintiff was able to perform "unskilled light work with some postural limitations" was improper in light of Dr. Lee's and DDS's assessments, plaintiff's fibromyalgia, and her own testimony.  These arguments have been addressed.

Plaintiff also contends that the ALJ should have utilized a vocational expert, rather than the grids, to determine whether plaintiff could perform "other jobs that exist in substantial numbers in the national economy."  Plaintiff argues that a vocational expert was warranted because plaintiff's nonexertional limitations significantly impacted her exertional capacities.

The Guidelines in table form ("grids") are combinations of residual functional capacity, age, education, and work experience.  At the fifth step of the sequential analysis, the grids determine if other work is available.  <u>See</u> generally <u>Desrosiers v. Secretary of Health and Human Services</u>, 846 F.2d 573, 577-78 (9th Cir. 1988) (Pregerson, J., concurring).

The grids may be used if a claimant has both exertional and nonexertional limitations, so long as the nonexertional limitations do not significantly impact the exertional capabilities.[9]  <u>Bates v. Sullivan</u>, 894 F.2d 1059, 1063 (9th Cir. 1990), overruled on other grounds,

---

[9] Exertional capabilities are the "primary strength activities" of sitting, standing, walking, lifting, carrying, pushing, or pulling.  20 C.F.R. § 416.969a (b) (1996); SSR 83-10, Glossary; Cooper v. Sullivan, 880 F.2d 1152, 1155 n. 6 (9th Cir.1989).  Non-exertional activities include mental, sensory, postural, manipulative and environmental matters which do not directly affect the primary strength activities. 20 C.F.R. § 416.969a (c) (1996); SSR 83-10, Glossary; Cooper, 880 F.2d at 1156 n. 7 (citing 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(e)).  "If a claimant has an impairment that limits his or her ability to work without directly affecting his or her strength, the claimant is said to have nonexertional (not strength-related) limitations that are not covered by the grids."  Penny v. Sullivan, 2 F.3d 953, 958 (9th Cir. 1993).

1  Bunnell v. Sullivan, 947 F.2d 341 (9th Cir. 1991) (en banc).  The ALJ, however, is not
2  automatically required to deviate from the grids whenever plaintiff has alleged a nonexertional
3  limitation.  Desrosiers, 846 F.2d at 577 ("[T]he fact that a non-exertional limitation is alleged
4  does not automatically preclude application of the grids."); 20 C.F.R. pt. 404, subpt. P, app. 2, §
5  200.00(e)(2) (1996).  The ALJ must weigh the evidence with respect to work experience,
6  education, and psychological and physical impairments to determine whether a nonexertional
7  limitation significantly limits plaintiff's ability to work in a certain category.  Desrosiers 846
8  F.2d at 578 (Pregerson, J., concurring).  "A non-exertional impairment, if sufficiently severe,
9  may limit the claimant's functional capacity in ways not contemplated by the guidelines.  In such
10  a case, the guidelines would be inapplicable."  Desrosiers, 846 F.2d at 577-78.  The ALJ is then
11  required to use a vocational expert.  Aukland v. Massanari, 257  F. 3d. 1033 (9th Cir. 2001).
12         Plaintiff contends that her nonexertional limitations included severe chronic pain,
13  chronic fatigue, impaired sleep, the need to lie down and sleep during the day, and impaired
14  concentration and focus.  Because these limitations could not be accurately captured by the grids,
15  plaintiff asserts, the ALJ improperly utilized them as a framework for decision making.  (See Tr.
16  at 22-23.)
17         Here, as set forth above, the ALJ found that plaintiff had the residual functional
18  capacity to perform unskilled, light work with some postural limitations. "Light" work would
19  involve lifting no more than 20 pounds occasionally and 10 pounds frequently; standing and
20  walking up to 6 hours in an 8 hour day; and sitting up to 6 hours in an 8 hour day, with "normal"
21  breaks. (Tr. at 18, 21.)  "Unskilled" work would involve little or no judgment to do simple
22  duties that can be learned on the job in a short period of time, and dealing primarily with objects,
23  rather than data or people. (Tr. at 18.)
24         In support of these findings, the ALJ noted that DDS found plaintiff limited to
25  light work with postural limitations, and that Dr. Lee also found plaintiff capable of performing
26  light work. (Tr. at 18.)  He noted recent medical reports indicating that plaintiff's pain was "well

controlled," as described above. He also found that plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms" were not fully credible, for the reasons discussed above. As to plaintiff's mental limitations, the ALJ concluded from the record that plaintiff had a "chronic mental problem[,]" which included "pain, depression, and auditory hallucinations." (Tr. at 22.) Due to these problems, the ALJ found that plaintiff was "limited to unskilled work," and could not perform any past relevant work as a car rental agent, floor supervisor, or service representative – all jobs which involve dealing primarily with people. (Tr. at 22.) The ALJ also cited the vocational analyses of state agency reviewers, who concluded that plaintiff could still do other jobs, including fruit distributor, cotton classer, and order caller. (Tr. at 23, citing Ex. 7E, Tr. at 144.) Moreover, in testimony, plaintiff indicated that her mental problems were not debilitating; rather, she testified that, if she didn't have physical problems, she would be able to work. (Tr. at 59.)

While plaintiff argues that her pain and sleep issues constitute severe non-exertional impairments, she fails to explain how these problems limit her abilities to a greater extent than determined by the ALJ. While pain can be a non-exertional limitation, "the fact that a non-exertional limitation is alleged does not automatically preclude application of the grids." Tackett v. Apfel, 180 F.3d 1094, 1102 (9th Cir.1999). Plaintiff does not point to any portion of the record to show that her pain treatment was ineffectual or to support her contention that her fatigue and sleep issues were severely limiting. Here, the ALJ concluded that plaintiff's non-exertional limitations were not severe enough to require the use of a vocational expert instead of the grids. This determination was supported by the record as a whole. The undersigned finds that the ALJ did not err in relying on the grids to determine what jobs plaintiff could perform.

\\\\\
\\\\\
\\\\\
\\\\\

CONCLUSION

For the reasons stated herein, IT IS ORDERED that: Plaintiff's Motion for Summary Judgment is denied; the Commissioner's Cross-Motion is granted; and the Clerk is directed to enter Judgment for the Commissioner.

DATED: 03/22/2011

/s/ Gregory G. Hollows

GREGORY G. HOLLOWS
U.S. MAGISTRATE JUDGE

math1802.ss.wpd
GGH:014